**UNITED STATES of America,
Plaintiff,**

v.

**Saul CIRRILLO–DAVILLA and
Guillermo Franco–Martinez,
Defendants.**

No. 4:00CR3017.

United States District Court,
D. Nebraska.

Jan. 10, 2001.

David W. Stempson, Assist. U.S. Atty., Lincoln, Ne, for Plaintiff.

Thomas R. Lamb, Anderson, Creager Law Firm, Lincoln, NE, for Franco-Martinez.

Jerry L. Thomas, Federal Public Defender's Office, Omaha, NE, John C. Vanderslice, Federal Public Defender's Office, Lincoln, NE, for Cirrillo-Davilla.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This case raises the question of what a sentencing judge should do when confronted with a drug quantity stipulation that may be too low. To make the issue more complex, if the judge tries to determine the truth, questions arise under *Apprendi*.[1] I will address all these questions next.

### I. Background

Defendants, Saul Cirrillo–Davilla (Davilla) and Guillermo Franco–Martinez (Martinez), were charged with a methamphetamine conspiracy. (Filing 1.) They were the only persons listed by name as co-conspirators, but other unnamed persons were alleged to be conspirators as well. The conspiracy was alleged to have taken place between approximately February 1, 1999 and November 30, 1999. The indictment, filed February 23, 2000, did not allege a specific quantity of methamphetamine. However, the cover sheets (found on the left-hand side of the court file) submitted with the indictment advised each defendant that the government believed that each defendant faced a 10 year statutory minimum sentence and a maximum of life in prison. Moreover, each defendant was advised at his arraignment that he faced 10 years to life in prison. (Tape of arraignments before Magistrate Judge Piester; Side A pertaining to Martinez (fourth case on Side A, counter # 2260); Side B pertaining to Davilla (first case on Side B, counter # 3140).)[2] Defendants entered pleas of not guilty and the case progressed.

### A. The Guilty Pleas

On August 1, 2000, Davilla tendered a plea of guilty to the conspiracy charge as alleged in the indictment. (Filing 33.) As noted earlier, the indictment contained no allegation of the quantity involved. On that same day, but before offering his guilty plea, Davilla was re-arraigned and informed, among other things, that he faced 10 years to life in prison if he pled guilty. (Filing 42 (Davilla Transcript) at 3–4.) Davilla then pled guilty after receiving an extensive advisement of his rights. (*Id.* at 30.)

Davilla's plea was made pursuant to a written plea agreement. (Filing 31.) Davilla's plea agreement specifically advised him as follows: "You understand that by entering this plea of guilty, you are exposed to imprisonment of not less than 10 years nor more than life [in prison]." (*Id.* ¶ 1.) The plea agreement contained a factual stipulation regarding drug quantity:

---

1. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (the Constitution requires that any fact that increases the penalty for a crime beyond the statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt) (*Apprendi*).

2. The Clerk of the Court is directed to file the reformatted tape and index in the court file.

"The parties hereby agree to recommend that you should be held responsible for at least 500 grams but less than 1.5 kilograms of methamphetamine, and therefore, pursuant to U.S.S.G. § 2D1.1, the defendant's base offense level is 32." (*Id.* ¶ 10.)[3] This portion of the plea agreement contained interlineations that were initialed by both counsel. (*Id.* ¶ 10.) The effect of the interlineation was to change the stipulated amount from at least 1.5 kilos but less than 5 kilos (base offense level 34) to at least 500 grams but less than 1.5 kilos (base offense level 32).

Magistrate Judge Piester, who conducted the Rule 11 proceeding, recommended that I accept the plea and the plea agreement with the explicit "understanding that such acceptance is subject to the provisions of U.S.S.G. § 6B1.4(d) ('The court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing')." (Filing 36 at 2.) Davilla was also advised that he had 10 days to object to the recommendation or he "may be deemed to have waived the right to object to the adoption of the report and recommendation." (*Id.* at 2.) Davilla did not object and I adopted the report and recommendation. (Filing 43.)

Martinez' case followed a nearly identical path. On August 3, 2000, he tendered a plea of guilty to the conspiracy charge as alleged in the indictment. (Filing 38.) Once again, the indictment contained no specification of the quantity involved. Before offering his guilty plea, Martinez, like Davilla, was re-arraigned and informed, among other things, that he faced 10 years to life in prison if he pled guilty. (Filing 41 (Martinez Transcript) at 9–10.) As his codefendant had done, Martinez then pled guilty after receiving an extensive advisement of his rights. (*Id.* at 34.)

Like Davilla, Martinez had struck a deal with the government that was reduced to writing. (Filing 35 (attachment to petition to enter a plea of guilty).) Martinez' plea agreement, like Davilla's, specifically advised him as follows: "You understand that by entering this plea of guilty, you are exposed to imprisonment of not less than 10 years nor more than life [in prison]." (Id. ¶ 1.) The plea agreement contained the same factual stipulation regarding drug quantity reached by Davilla; that is, "The parties hereby agree to recommend that you should be held responsible for at least 500 grams but less than 1.5 kilograms of methamphetamine, and therefore, pursuant to U.S.S.G. § 2D1.1, the defendant's base offense level is 32." (*Id.* ¶ 10.) Like Davilla's plea agreement, Martinez' plea agreement contained interlineations that were initialed by the defendant and both counsel. (*Id.* ¶ 10.) The effect of the interlineations was to change the stipulated amount from at least 1.5 kilos but less than 5 kilos (base offense level 34) to at least 500 grams but less than 1.5 kilos (base offense level 32).

As with Davilla, Judge Piester recommended that I accept the plea and the plea agreement with the explicit "understanding that such acceptance is subject to the provisions of U.S.S.G. § 6B1.4(d) ('The court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing')." (Filing 39 at 2.) Martinez was also advised that he had 10 days to object to the recommendation or he "may be deemed to have waived the right to object to the adoption of the report and recommendation." (*Id.*) Martinez did not object and I adopted the report and recommendation. (Filing 44.)

---

3. Although the language the parties used was not consistent, both plea agreements pertained to "a mixture or substance containing a detectable amount" of methamphetamine rather than "actual" methamphetamine as those terms are used in United States Sentencing Commission, *Guidelines Manual*, § 2D1.1(c) nn.(A) & (B) (Notes to Drug Quantity Table) (Nov.1998). (Filing 31 ¶ 1 (Davilla); Filing 35 ¶ 1 (attached plea agreement) (Martinez).)

## B. The Presentence Reports

The probation office then began to prepare a presentence report (PSR) for each defendant. Probation officer Raul Avalos, Jr., was assigned to both cases.

In the District of Nebraska, probation officers are instructed to look beyond the government's version of the offense and any factual stipulations of the parties so that the court is independently advised of the real facts. Pursuant to that instruction, Mr. Avalos interviewed the case agent, Galen Svoboda, a Nebraska State Patrol drug investigator. (Davilla PSR ¶¶ 21–22; Martinez PSR ¶¶ 27–28.) The case agent contradicted the drug quantity stipulation.

Svoboda told the probation officer that Martinez was a drug dealer and Davilla was Martinez' "right hand man" during part, but not all, of the conspiracy (Davilla PSR ¶ 21; Martinez PSR ¶ 27) and that, excluding the cocaine and marijuana which both men sold, Martinez was responsible for about 10.57 kilos of methamphetamine (Martinez PSR ¶¶ 27–28) and Davilla was responsible for about 6.95 kilos of methamphetamine (Davilla PSR ¶ 22). Svoboda's sources of knowledge included a controlled "buy" from Defendants, followed by a search near a trailer used by both men which produced more methamphetamine and cocaine, and interviews with various witnesses, including Dora Garza and Michael McDermott.

According to what Svoboda told Probation Officer Avalos, 8 to 10 pounds of the 10.57 kilos of methamphetamine attributed to Martinez by Svoboda was distributed by Martinez to Dora Garza. (Martinez PSR ¶ 27.) But, most of those distributions took place before the time frame alleged in the indictment, and it is clear that those distributions did not involve Davilla. (*Id.* ¶¶ 27–28.)

I have not included the distributions to Garza when calculating the base offense level for Martinez or Davilla because Svoboda did not testify about them at the evidentiary hearing which I later ordered, and the government did not produce Garza to testify at that hearing. In addition, it appears that most of these distributions predated the conspiracy. In any event, I lack reliable information about these transactions since Garza did not testify. As a practical matter, this means that the maximum Martinez and Davilla could be held responsible for is approximately 6.95 kilos of methamphetamine without including other drugs like cocaine or marijuana.

Even if one excluded the cocaine and marijuana and focused only on the methamphetamine, the probation officer found that both men faced a base offense level of 36 and not level 32 as the government and Defendants had stipulated. U.S.S.G. § 2D1.1(a)(3)(c)(2) (at least 5 KG but less than 15 KG of methamphetamine); (Martinez PSR ¶¶ 33, 67; Davilla PSR ¶¶ 27, 71.) Using a drug equivalency calculation, the probation officer also found that if the marijuana and cocaine were considered together with the methamphetamine the base offense level would remain 36 for both men. (Martinez PSR ¶¶ 33, 67; Davilla PSR ¶¶ 27, 71.).

After giving Martinez the benefit of the "safety-valve" and the adjustment for acceptance of responsibility, the probation officer concluded that Martinez' total offense level was 31. (Martinez PSR ¶¶ 34, 39, 40.) His criminal history category was I. (Martinez PSR ¶ 46.) This meant that Martinez faced an imprisonment range of 108 to 135 months in prison.[4] (*Id.* ¶ 66.)

After giving Davilla the benefit of an adjustment for acceptance of responsibility, the probation officer stated that Davilla's total offense level was 33. (Davilla PSR ¶¶ 33–34.) His criminal history category was II. (*Id.* ¶ 43.) Davilla thus faced

---

4. Because Martinez fit the "safety-valve," he could escape the mandatory minimum sentence of 10 years. *See* 18 U.S.C. § 3553(f).

a prison term of between 151 to 188 months in prison. (*Id.* ¶ 70.)

## C. The Objections to the Presentence Reports

Defendants objected to the presentence reports, contending either that the court was bound by the factual stipulation as to quantity because it had accepted the plea agreements or that the court should adopt that stipulation as its factual conclusion. (Filing 47 (Davilla); Filing 48 (Martinez)). Later, the government in effect joined these objections. (Filing 57 (Transcript of Evidentiary Hearing) (hereinafter Evid. Tr.) at 6–7.)

Davilla also objected to his criminal history score, which was based on two misdemeanor convictions. I now sustain that objection. On one conviction, there is a serious question whether Davilla was the person who was convicted, because of the following: the papers showed the defendant in the misdemeanor case was named "Ramiro Garcia"; the government submitted no evidence on the question; and the probation officer could not obtain the background records from the relevant county court to establish that Davilla was the person convicted of the misdemeanor. (Evid. Tr. at 115–16; Davilla PSR ¶ 39.)

The other criminal history matter involved an uncounseled misdemeanor conviction that resulted in a jail sentence. (Evid. Tr. at 110–15; Davilla PSR ¶ 40.) Uncounseled misdemeanor convictions that result in jail time cannot be counted under the Guidelines for criminal history purposes. *Nichols v. United States*, 511 U.S. 738, 743–49, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (a sentencing court may consider the defendant's previous uncounseled misdemeanor conviction when sentencing him for a subsequent offense so long as the previous uncounseled misdemeanor conviction did not result in a sentence of imprisonment); *United States v. Ortega*, 94 F.3d 764, 770–71 (2nd Cir.1996) (uncounseled

misdemeanor convictions that result in jail time may not be counted for criminal history purposes under the Guidelines). *Cf. United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (uncounseled felony convictions that result in jail time may not be used to enhance a later sentence).[5]

Davilla also claimed that he was entitled to a mitigating role reduction, but, as discussed more thoroughly in later portions of this opinion, he was too involved to warrant such a reduction. *See, e.g., United States v. O'Dell*, 204 F.3d 829, 837–38 (8th Cir.2000) (role reduction was properly denied when defendant was "'deeply involved'"); U.S.S.G. § 3B1.2, comment. (nn.1–3) & comment. (backg'd). Davilla was intimately involved for months in many facets of the conspiracy. Davilla's conduct included arranging for drug sales, delivering drugs and collecting money. (Evid. Tr. at 65–68, 76–83.) Accordingly, Davilla's objection as to role in the offense is denied.

Finally, Davilla moved for a downward departure because he was a deportable alien who would be deprived of certain benefits in prison (intensive drug treatment/half-way house placement) as a result. Recognizing that I have the power to depart, but electing not to do so, I note that if Davilla is deported he will most likely avoid supervised release. Thus, the fact he may be denied certain prison benefits because of his deportable alien status is not a good reason to depart since he may also profit from that condition as well. *See, e.g., United States v. Navarro*, 218 F.3d 895, 898 (8th Cir.2000) (denial of departure based on status as an alien subject to deportation was not an abuse of discretion; district court observed that the defendant would also avoid supervised release).

5. Since my ruling on the criminal history score may make Davilla eligible for the "safety-valve," I will direct the probation officer to promptly supply a revised presentence report addressing Davilla's eligibility for the "safety-valve."

## D. The Evidentiary Hearing on Quantity

On October 6, 2000 (filing 45 (Davilla)) and October 13, 2000 (filing 49 (Martinez)), I took up the objections to the presentence reports. To resolve the quantity and other issues, I ordered an evidentiary hearing for November 20, 2000. But, on November 20, 2000, the government was not prepared to present evidence. (Filing 62 (Status Hearing Transcript) (hereinafter Status Tr.) at 3–4.)

As a result, I ordered the government to procure the attendance of the case agent, Galen Svoboda, and the primary individual who was giving evidence against both defendants, Michael McDermott. (Status Tr. at 5.) I also suggested that the government produce "whatever other witnesses the government thinks it needs ... to prove up the quantities that it thinks [are] appropriate." (*Id.* at 5–6.) In addition, I offered Defendants an opportunity to withdraw their guilty pleas, but they each declined to do so. (*Id.* at 5.) Defendants also objected to continuing the hearing and requested a jury trial to decide the quantity issue. (*Id.* at 5–6.) I denied their objection and their request for a jury trial. (*Id.* at 5–9.)

On December 15, 2000, the parties appeared once again. By that time, the government had obtained the presence of Svoboda and McDermott as I had ordered. Despite my earlier suggestion, the government did not obtain the presence of other witnesses who might have been able to give relevant testimony on the quantity issue.[6]

Defendants objected to the court requiring the government to examine Svoboda and McDermott, and instead requested that the court examine the witnesses, allowing all counsel to ask questions after the court's examination. (Evid. Tr. at 8–11.) I followed the procedure requested by Defendants. I also offered Defendants another opportunity to withdraw their pleas, and once again they declined. (*Id.* at 12–14.)

### The Case Agent's Testimony

The first witness to testify was the case agent, Galen Svoboda. Svoboda's testimony regarding Martinez was as follows: (1) based upon interviews with McDermott, Martinez was involved in the actual handling of 6.5 pounds of methamphetamine, approximately 61 pounds of marijuana, and 1.5 to 2 pounds of cocaine (Evid. Tr. at 24); (2) based upon his personal observation, Martinez and Davilla delivered to Svoboda 170 grams of methamphetamine shortly before the arrest (*id.* at 25)[7]; (3) based upon his investigation following the arrest, 180 grams of methamphetamine and 42 grams of cocaine were found at a trailer where Martinez and Davilla were located prior to making the delivery to Svoboda (*id.* at 25–26); and (4) based upon lab tests, the methamphetamine found at the trailer and the methamphetamine delivered to Svoboda "was exactly the same quantitative [purity] level." (*Id.* at 27.)

Svoboda had information regarding Martinez' involvement in the distribution of additional pound quantities of methamphetamine, but he had been instructed by the Drug Enforcement Administration (DEA) not to disclose that information for fear that it might jeopardize an ongoing investigation. (Evid. Tr. at 27–28.) Since the Special Assistant United States Attorney handling this case was unaware of these instructions from the DEA and I did not wish to jeopardize an ongoing investigation, I elected not to pursue those addi-

6. For example, the government did not produce Dora Garza to testify about her dealings with Martinez. While this failure concerns me, much of Garza's information apparently dealt with a time frame that predated the conspiracy.

7. These quantities were in addition to the quantities described by McDermott. (Evid. Tr. at 25, 34.)

tional quantities.[8] (*Id.* at 28–34.) I made clear that I would not count these additional pounds of methamphetamine against Defendants since Svoboda could not discuss the details. (*Id.* at 34.) I also offered a continuance to Defendants to pursue any questions that might have regarding the instructions given to the case agent by the DEA, but counsel did not desire a continuance. (*Id.* at 55–56, 59–62.)

Regarding Davilla, Svoboda testified as follows: (1) based upon what McDermott told him, after Martinez had a falling out with a person named Armando who had been his interpreter, Davilla began his involvement with Martinez as an interpreter (Evid. Tr. at 64); (2) based upon what McDermott told him, Davilla was with Martinez "about 90% of the time that deals were consummated or money was picked up" (*id.*); (3) based upon what McDermott told him, Davilla should be held responsible for 90% of the 6.5 pounds of methamphetamine, 61 pounds of marijuana, and 1.5 to 2 pounds of cocaine because Davilla was present during 90% of those distributions serving as an interpreter, collecting money and otherwise facilitating the transactions (*id.* at 65–66); (4) based upon his own personal observation, Davilla was also responsible for the 170 gram methamphetamine delivery to Svoboda because Davilla arranged that transaction over the phone, Davilla was with Martinez when the drugs were delivered to Svoboda, Davilla drove the car used by the two men to make the delivery, and, at the end of the transaction, Davilla "handed me a piece of paper with the same cell phone number that I just previously dialed to make the controlled call and said call if you need anything" (*id.* at 67); and (5) while Davilla was at the

trailer where the other drugs were later found and while the purity of the methamphetamine found at the trailer matched the purity of the methamphetamine delivered to Svoboda by Martinez and Davilla, Martinez later told Svoboda that Davilla did not know about the other drugs found at the trailer (*id.* at 67–68).

### McDermott's Testimony

McDermott then testified as follows: (1) during the time span of the conspiracy, McDermott had drug dealings with both Martinez and Davilla regarding methamphetamine, marijuana and cocaine (Evid. Tr. at 76); (2) McDermott knew Martinez as "Jorge" and Davilla as "Raul" (*id.*); (3) McDermott dealt with Martinez from February or March of 1999 until he was arrested on October 26, 1999 (*id.* at 78); (4) at first Armando worked with Martinez as a drug sale interpreter, but in June or early July Davilla took over this job with Martinez (*id.* at 77); (5) excluding the drugs he received when Armando was involved and drugs he got from Martinez that he did not sell (*id.* at 90), McDermott received about 5 pounds of methamphetamine from Martinez (*id.* at 78); (6) he dealt with Martinez at least once a week and later twice a week, never receiving less than an ounce and sometimes receiving pound, half-pound, and quarter-pound quantities (*id.* at 79); (7) he received about 60 pounds of marijuana and about 1.5 pounds of cocaine from Martinez (*id.* at 80); (8) Davilla "was the interpreter" who "pretty much came along with Jorge [Martinez] most of the time," and when McDermott wanted to contact Martinez, he would speak to Davilla, and both men would come over to distribute drugs (*id.* at 81–82); (9) Davilla picked up drug money and

---

8. I am troubled that the DEA instructed Svoboda not to disclose relevant information. This is particularly true because the Assistant United States Attorney handling the case was unaware of the DEA's concerns or instructions. At the end of the hearing, I requested the prosecutor to investigate and advise me whether further inquiry could be made of Svoboda about these additional quantities without harming an ongoing investigation. (Evid. Tr. at 130–31.) He has now responded and requested that I inquire no further, claiming, in part, that "further testimony by Galen Svoboda concerning the subject which caused the concern could, in fact, compromise an ongoing OCDETF investigation." (Filing 60 (sealed letter dated December 28, 2000).) I will honor the government's request.

distributed drugs (*id.* at 82); (10) Davilla, alone and without Martinez, delivered both marijuana (25 pounds) and methamphetamine to McDermott (*id.* at 82–83); (11) Davilla was present when Martinez was present "about 90% of the time" (*id.* at 83); and (12) he thought Martinez and Davilla were "partners" because Davilla "would speak like in [the] third person or when he was talking about either one of them, he would always refer even to himself as Jorge [Martinez]." (*Id.* at 104.)

Before his testimony, and pursuant to a plea agreement with the government, McDermott was sentenced for conduct associated with this case to 120 months in prison. (Evid. Tr. at 83–84.) McDermott had two prior felony convictions for drugs, one involving a suspended sentence and one for which he did time in prison. (*Id.* at 84.) When dealing with Martinez and Davilla, McDermott was using methamphetamine, cocaine (but "not real often") and "weed" ("quit regularly"). (*Id.* at 85.) McDermott admitted that he was addicted to methamphetamine during this time. (*Id.*)

McDermott was vigorously cross examined. During those examinations, he stated, among other things, the following: (1) when he dealt with Martinez and Davilla, he was also receiving large quantities of drugs from other suppliers (Evid. Tr. at 85–86); (2) he admitted that he had previously given differing statements about quantities, but not "drastically different considering we are talking about something that happened well over a year ago" (*id.* at 88); (3) he hoped that the government would file a Rule 35 motion requesting a reduction of his sentence as a result of his testimony in this case, but he did not think one had been filed yet (*id.* at 89); (4) while at his lawyer's office, he was interviewed over the phone by a federal public defender and the defender's investigator

and he told them that "the quantity of meth was somewhere between three to five pounds" [9] (*id.* at 90); (5) he had told different interviewers different things about how many "one pound deals" he could recall (*id.* at 92); (6) Davilla was Martinez's third interpreter (Armando was first, followed by an individual who I will refer to as "Maria," followed by Davilla) (*id.* at 93–94); and (7) he used LSD and mushrooms in 1999 and "tripped" twice (*id.* at 97).

## Defense Evidence—Written Statements

Davilla offered into evidence, without objection, sealed exhibits 101 through 104. (Filing 58.) Those exhibits were statements made by Defendants, McDermott and another cooperating individual who I will refer to as "Maria." Defendants, McDermott and "Maria" were represented by counsel when they gave the statements. (Sealed Exs. 101–104.)

Among other things, Davilla stated the following: (1) he was present on four occasions when Martinez sold drugs to McDermott, and those drugs included cocaine and methamphetamine (Sealed Ex. 101 at 3); (2) with Davilla serving as the interpreter, McDermott and Martinez spoke about prices, including $800 per ounce and sums of between $5,000 to $6,000 (*id.* at 3–4); and (3) Davilla went with Martinez on ten or fifteen occasions to collect drug money from McDermott (*id.* at 4).

Martinez stated, among other things, as follows: (1) Martinez lived with Davilla in a trailer that Davilla owned (Ex. 102 at 1) and, although he could not estimate the total quantity involved, he delivered ½ gram to 1 gram quantities of cocaine to Davilla (*id.* at 4); (2) the methamphetamine delivery to Svoboda occurred as follows: Davilla asked Martinez to come over to another trailer in the trailer court, when he got there, Martinez received a phone call, after that conversation, Martinez then

9. Davilla offered into evidence a memorandum summarizing this interview. What the memorandum said was this: "From approximately late June/early July up until the date of

the indictment, McDermott obtained methamphetamine in the 3–5 lb. range from codefendant with defendant (Saul Cerilo Davila [sic] )." (Sealed Ex. 103.)

called another person and handed the phone to Davilla, then Davilla went with him to make the drug delivery, and Davilla did not know about the other drugs that were left in the trailer [the 180 grams of methamphetamine and 42 grams of cocaine found following the arrest] (*id.* at 2); (3) Martinez sold marijuana, methamphetamine, and cocaine to McDermott (*id.* at 4); (4) Davilla assisted Martinez with the interpretation of drug deals involving McDermott, and Martinez estimated that Davilla interpreted four to six occasions where approximately 1 pound of methamphetamine, 25–26 pounds of marijuana and 4 ounces of cocaine were sold to McDermott (*id.*); and (5) Armando and "Maria" also interpreted on some of his drug deals with McDermott, although he did not describe the quantities involved in those transactions (*id.* at 4–5).

As previously noted, McDermott gave a telephone statement to a federal public defender and the defender's investigator. In that statement McDermott reported, among other things, as follows: (1) he "first hooked up with" Martinez in April or May of 1999, with Armando serving as the interpreter (Ex. 103 at 1); (2) according to Davilla, Armando "ripped off" Martinez, and Davilla became the interpreter (*id.*); (3) from late June or early July until the date of the indictment McDermott obtained methamphetamine "in the 3–5 lb. range" from Martinez and Davilla (*id.*); (4) 25 pounds of marijuana were delivered the night before the arrest (*id.*); (5) Davilla's role "involved interpreting for [Martinez], helping deliver drugs to McDermott, and picking up money from McDermott" [10] (*id.* at 2); (6) "McDermott said that the dope was always [Martinez'] dope and that [Martinez] called the shots" (*id.*); (7) Davilla would talk in the third person when translating for Martinez (*id.*); (8) "Maria" served as an interim translator before Davilla took over (*id.*); (9) McDermott never received less than 1 ounce of methamphet-

amine and usually a couple of ounces at a time (*id.*); (10) "there were two times involving 1 lb. meth and 4–6 times ('at least 4 and maybe 6') involving a quarter pound" (*id.*); (11) including the 25 pounds of marijuana delivered shortly before the arrest, McDermott purchased between 70 and 80 pounds of marijuana (*id.*); (12) while methamphetamine was the most common drug, McDermott purchased "a minimum of 1.5 lbs. to maybe 2 lbs" of cocaine (*id.*); (12) Martinez set the price for drugs and the usual price for methamphetamine was $900 per ounce, the usual price for cocaine was $1000 to $1050 per ounce, and the usual price for marijuana was $900 per pound (*id.* at 3); and (13) while McDermott used Martinez and Davilla "almost exclusively[,]" McDermott had "other sources, but those were mainly for his own personal use drugs." (*Id.* at 4.)

"Maria" gave a statement. Among other things, she stated as follows: (1) she served as a translator for Martinez involving about 50 drug deals between McDermott and Martinez (Ex. 104 at 2); (2) she observed drugs change hands between McDermott and Martinez on five occasions, three of those occasions involving cocaine in packages that were smaller than a baseball and two of those occasions involving methamphetamine packages the size of a baseball (*id.*); (3) "Maria" heard and interpreted drug conversations between McDermott and Martinez involving amounts ranging from $3,000 to $5,000 (*id.* at 3); (4) she collected drug money from McDermott for Martinez on two occasions, one involving $500 (*id.*); (5) Davilla began serving as an interpreter for Martinez in either May or June of 1999, (*id.*); (6) Davilla and Martinez rented a trailer together (*id.*); and (7) after he was arrested for delivery of methamphetamine, Martinez asked "Maria" and her daughter to collect money from McDermott (*id.* at 5).

---

**10.** The exhibit also states that "Defendant was basically an interpreter and 'go-fer.'" (Ex. 103 at 2.) This appears to have been the conclusion of the interviewer as opposed to a quotation from McDermott.

## II. Discussion

Before resolving the quantity issue, I address the following preliminary questions:

When a district judge doubts a drug quantity stipulation contained within an accepted plea agreement, what powers does that judge have to examine the facts, question witnesses and reach a conclusion contrary to the quantity stipulation?

If the judge has the power to look beyond the stipulation to decide the true facts, are the defendants nevertheless entitled to a jury trial on the quantity issue?

If the judge has the power to look beyond the stipulation to decide the true facts, what standard of proof should be employed when resolving the quantity issue?

If the judge has the power to look beyond the stipulation to decide the true facts, what must the indictment provide?

In the future, how can a court avoid the problems created by these questions?

After addressing these matters, I will decide the quantity issue.[11]

### A. The Judge is Not a "Potted Plant" When it Comes To Drug Quantity Stipulations

■ The parties argue that having accepted the plea agreements, I am also bound to follow the stipulations contained within those plea agreements regarding drug quantity. With all due respect, they are incorrect.

The Guidelines provide "[t]he court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing." U.S.S.G. § 6B1.4(d), p.s. "Rather, in determining the factual basis for the sentence, the court will consider the stipulation, together with results of the presentence investigation, and any other relevant information." U.S.S.G. § 6B1.4, comment. (backg'd.).

■ As a result of these Guidelines, "[a] sentencing court is not bound by stipulations entered into by a defendant and the United States in conjunction with a plea agreement and the court is allowed to determine facts relevant to sentencing with the aid of the PSR." *United States v. Barton,* 16 F.3d 1228 (8th Cir.1994) (table), *available at* 1994 WL 5645 (affirming the sentence of the district court where plea agreement indicated that defendant possessed 19 kilograms of marijuana, but the evidence showed and the court found that the defendant was actually responsible for 91.8 kilograms) (citing *United States v. Westerman,* 973 F.2d 1422, 1426 (8th Cir. 1992)). *See also United States v. Randolph,* 101 F.3d 607, 609 (8th Cir.1996) (on appeal by the government, the court held that although district court is not bound by a drug quantity stipulation, the court should explain why it deviated from the stipulation by finding a' lesser quantity than was agreed to by the defendant).

The case of *United States v. Granados,* 168 F.3d 343 (8th Cir.1999) does not help Defendants either. In *Granados,* the government and the defendant entered into a written stipulation in which the government agreed to amend the indictment to charge Granados with one count of conspiracy to distribute more than 3.5 kilograms, but less than 5 kilograms of cocaine, as opposed to the original indictment that alleged between 5 kilograms and 15 kilograms. In the stipulation, the government expressly agreed that the scope of the relevant conduct attributable to the defendant would not exceed 5 kilograms of cocaine. *Id.* at 346 n. 5. Granados objected to the presentence report which attributed 5 to 15 kilograms to him. The government, in violation of the stipulation, stated that the presentence report was correct. *Id.* at 345 n. 4. At the time

---

11. At the conclusion of the evidentiary hearing, I offered all parties an opportunity to brief this case. (Evid. Tr. at 118.) They declined the invitation. (*Id.*)

of sentencing, Granados' lawyer did not call to the attention of the sentencing judge the terms of the plea agreement or the violation of the plea agreement by the government's lawyer. *Id.* at 345. The Court of Appeals found that defense counsel's failure to call the matter to the attention of the judge at sentencing prejudiced the defendant and warranted a new sentencing hearing. *Id.* at 346. In so doing, the court noted in a footnote that: "After accepting the plea agreement, Fed. R.Crim.P. 11(e)(3) requires the court to 'inform the defendant that it will embody in the judgment and sentence the disposition provided for in the plea agreement.' The record indicates that did not occur." *Id.* at 345 n. 3.

There are at least four reasons why footnote 3 of *Granados* does not apply. Unlike *Granados*, in this case there was no violation of the plea agreement by the government and I am fully aware of the quantity stipulation of the parties. *United States v. Wehrbein*, 61 F.Supp.2d 955, 958 (D.Neb.1999) ("Fairly read, *Granados* stands for the proposition that the government must act consistently with a plea agreement.... *Granados* does not stand for the proposition that the approval of a non-Rule 11(e)(1)(C) plea agreement also requires the court to blindly follow a stipulation that is both inconsistent with the Guidelines and solely between 'the parties.' ") Next, however the plea agreement was construed in *Granados*, the plea agreements in this case did not call for a specific disposition in terms of a sentence or sentencing range.[12] *See id.* Indeed, these plea agreements state only that the parties "recommend" a particular drug quantity, and the plea agreements explicitly exposed Defendants to life in prison. Next, *Granados* must be read consistently with the Guidelines and cases like *Barton.* That law makes clear that a sentencing court is not bound by drug quantity stipulations in plea agreements, and Defendants

were explicitly advised of this in Judge Piester's reports and recommendations regarding their plea agreements. Finally, I have repeatedly offered to allow Defendants to withdraw their pleas, and they have chosen not to do so. So, unlike the defendant in *Granados*, here Defendants have no justifiable "reliance" interest that should be protected. *Cf.* Fed.R.Crim.P. 11(e)(4) (if the court rejects a plea agreement, it must inform the parties that it is not bound by the plea agreement and afford the defendant the opportunity to withdraw the plea).

In addition to arguing that I am bound to follow the drug quantity stipulations in the plea agreement, Defendants seem to argue that the court may not call and examine witnesses to get at the facts. Once again, I respectfully disagree.

As just noted, the Guidelines themselves contemplate an active rather than a passive role for the court when deciding the factual basis for a sentence. U.S.S.G. § 6B1.4(d), p.s.; *id.* § 6B1.4, comment. (backg'd.). In addition, at least one federal appellate court has approved the practice of trial courts calling witnesses to decide drug quantity issues just as I have done. *United States v. Garcia*, 78 F.3d 1457, 1462–63 (10th Cir.1996) (citing, among other authorities, U.S.S.G. § 6B1.4(d)). In *Garcia*, the court explained:

> Judge Brett acted within his discretion by investigating issues raised in the Presentence Report which conflicted with the government's stipulations. The judge had an obligation under the guidelines and Tenth Circuit precedent to consider whether the stipulated facts accurately reflected all conduct relevant to a proper sentence. When the government refused to cooperate in the judge's efforts to confirm the Presentence Report, the court called and examined wit-

---

**12.** The parties do not contend, and the agreements do not provide, that the pleas were made pursuant to Fed.R.Crim.P. 11(e)(1)(C)

(pertaining, in part, to agreements calling for specific sentences or specific sentencing ranges).

nesses to verify the accuracy of the report. The court was not under any duty to accept the government's stipulation that the relevant conduct involved less than 100 grams of cocaine or that McGowan and Stickman were untrustworthy.

*Id.* Still further, the Federal Rules of Evidence specifically authorize a district judge to call and examine witnesses to ascertain the truth. Fed.R.Evid. 614 (authorizing judges to call and interrogate witnesses so long as the parties are afforded an opportunity to cross-examine witnesses thus called). *See also* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* ¶ 614.02[1] at 614–5 (2000) ("Judges may call and interrogate witnesses, enabling them to obtain information they deem essential to a just and proper decision but which the parties have failed to provide.") (footnote omitted) (citing *United States Marshals Service v. Means,* 741 F.2d 1053, 1057–1059 (8th Cir. 1984)). In sum, these authorities establish that I had the power and the responsibility to call witnesses and interrogate them to ascertain facts relevant to the quantity of drugs attributable to each defendant even though the parties had recommended a specific quantity.

Lastly, Defendants argue that I violated "separation of powers" principles by directing the government to obtain the attendance of witnesses. The Tenth Circuit has rejected a similar argument, *Garcia,* 78 F.3d at 1462, and so do I. Based on the authorities just cited, I could have subpoenaed the witnesses. A subpoena, of course, would have commanded the United States Marshal to serve that process. The United States Marshal is an executive branch officer. Since I plainly had the power to issue a subpoena, I fail to see how I have intruded upon the executive branch by using the more informal method of ordering a prosecutor to obtain the attendance of a witness rather than by using a subpoena to command the United States Marshal.

## B. Defendants Are Not Entitled to a Jury Trial Regarding Quantity

■ Defendants argue that if I do not accept their stipulation regarding drug quantities, then they are entitled to a jury trial on that issue by extension of the principles announced in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (the Constitution requires that any fact that increases the penalty for a crime beyond the statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt). Although the parameters of *Apprendi* are not clear, *see generally,* Federal Judicial Center, *Reference Materials for Charging and Sentencing After Apprendi* (December 13, 2000) (including Laurie L. Levenson, *Charging and Sentencing After Apprendi* and Nancy J. King & Susan R. Klein, *Apres Apprendi* ) (hereinafter *Reference Materials* ), I disagree with Defendants' assertion that they are entitled to a jury trial to decide quantity issues for two reasons. Before explaining the two reasons I disagree with Defendants, I will review the background.

The statutory maximum sentence (life imprisonment) for a drug conspiracy involving methamphetamine is triggered when 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine is involved. 21 U.S.C. §§ 841(b)(1)(A)(viii), 846. If no particular quantity of methamphetamine is involved, the defendant has no prior drug conviction and death or serious bodily injury did not result, the statutory maximum is 20 years in prison. 21 U.S.C. §§ 841(b)(1)(C), 846.

Defendants have agreed in their plea agreements that they are responsible for at least 500 grams of methamphetamine, and they have been consistently advised that the maximum penalty they face is life in prison. In fact, each plea agreement warned them that they faced that statutory maximum. Thus, despite being advised that they faced life in prison, they have

explicitly agreed that they are eligible for that statutory maximum because they stipulated to the threshold drug quantity of 500 grams. They have also waived their right to a jury trial during their Rule 11 proceedings, and thereafter repeatedly refused the opportunity to withdraw their pleas. With this background in mind, I now turn to the two reasons I believe justify denying Defendants a jury trial on the issue of quantity.

First, Defendants cannot "have their cake and eat it too." That is, after having been repeatedly advised that they faced life in prison during their arraignments, Davilla and Martinez should not be allowed to stipulate to a fact that makes them eligible for life in prison as a part of a plea agreement, and then claim they have a right to a jury to decide a fact that they agree is not in dispute. After all, in *Apprendi* the defendant *denied* the aggravating factor that permitted the judge to sentence the defendant beyond the statutory maximum penalty. *Apprendi*, 120 S.Ct. at 2352 ("Apprendi adduced evidence from a psychologist and from seven character witnesses who testified that he did not have a reputation for racial bias. He also took the stand himself, explaining that the incident was an unintended consequence of overindulgence in alcohol, denying that he was in any way biased against African-Americans, and denying that his statement to the police had been accurately described. The judge, however, found the police officer's testimony credible, and concluded that the evidence supported a finding 'that the crime was motivated by racial bias.'"). Simply put, since Davilla and Martinez *do not dispute* the aggravating factor (at least 500 grams) that makes them eligible for life in prison, they have no right to a jury trial to decide the aggravating factor.

Second, and as discussed more fully later, I will not sentence either defendant to more than 20 years in prison (the maximum sentence authorized without regard to quantity), and, therefore, the jury trial right articulated in *Apprendi* does not apply. *United States v. Aguayo–Delgado*, 220 F.3d 926, 934 (8th Cir.) (Sentences "within the statutory range authorized by § 841(b)(1)(C) without reference to drug quantity ... are permissible under *Apprendi* ... even where the drug quantity was not charged in the indictment or found by the jury to have been beyond a reasonable doubt."), *cert. denied*, —— U.S. ——, 121 S.Ct. 600, 148 L.Ed.2d 513 (2000).

## C. The Preponderance Standard Applies

For basically the same reasons that Davilla and Martinez do not have a right to a jury trial to decide the quantity issue, they do not have a right to have the quantity issue decided beyond a reasonable doubt. In particular, having stipulated to a threshold quantity that makes them eligible for life in prison after having been advised at arraignment that they faced life in prison, and having waived their right to a jury trial, the normal preponderance of the evidence standard applies. That is, they have admitted that they are eligible for life in prison, and the facts of *Apprendi* make clear that it only applies when the aggravating factor (in this case 500 grams) is disputed by the defendant. *Cf. United States v. Poulack*, No. 00–1595, 2001 WL 15734, at *4 (8th Cir. January 9, 2001) ("Because Poulack stipulated to the reduced drug quantity figure when he had knowledge that quantity was a key factor, he waived his right to a jury determination on that issue.") Moreover, since I will not sentence either defendant to more than 20 years in prison (the least onerous "maximum" under 21 U.S.C. § 841 for methamphetamine), the preponderance of the evidence standard is the appropriate standard to apply in any event. *See United States v. Nicholson*, 231 F.3d 445, 453 (8th Cir. 2000) (Where the punishment actually imposed was within the statutory range, "[t]he Court was authorized to make findings by a preponderance of the evidence in order to apply the Guidelines.").

## D. The Grand Jury Question

■ The indictment did not allege the 500 gram threshold that exposes Defendants to life in prison. Although not raised by Defendants as an objection, this failure is problematic under the Grand Jury Clause of the Fifth Amendment. *See, e.g., Reference Materials* at 5, 20.[13] But, because I will not sentence Defendants to more than 20 years in prison, the error, if any, may be ignored under the reasoning of *Aguayo–Delgado,* 220 F.3d at 934. Nevertheless, and once again, if Defendants wish to withdraw their pleas prior to sentencing, I would likely grant such a request.

## E. Future Drug Cases

In the future, the government would be well advised to plead the appropriate quantity threshold in *every* drug indictment if it wishes to take advantage of an enhanced maximum penalty. If the government has not done so, it should consider a superseding indictment. Apart from jury trial or due process concerns, absent the appropriate quantity allegation in an indictment, the Grand Jury Clause of the Fifth Amendment may prohibit enhanced sentences even where the defendant has been arraigned as if the appropriate allegation was contained within the indictment.

In addition, more care should be taken during first appearances, arraignments and Rule 11 proceedings to make sure that all defendants are advised of the correct maximum penalty in drug cases. This requires a careful examination of the facts in relation to 21 U.S.C. § 841. It is doubtful that a sentence which exceeds the maximum penalty set forth in the advisement could ever lawfully be imposed.

Furthermore, to cut down on future disputes regarding the jury trial and due process questions raised by *Apprendi* (but not necessarily the Grand Jury Clause issue), I will (and I request that magistrate judges) discuss *Apprendi* rights with defendants during Rule 11 proceedings. That discussion can be simple. We might advise the following:

> The Constitution requires that any fact that increases the penalty for a crime beyond the statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. By pleading guilty you waive and give up that right. By waiving and giving up that right, a judge will decide by the greater weight of the evidence facts relevant to sentencing and the maximum penalty. The judge will decide these facts as he or she sees fit even if you and the government agree to different facts.

## F. The Quantities

■ I have carefully examined the testimony and exhibits presented at the evidentiary hearing. As a result of that examination, I conclude that Martinez' base offense level should be 34 rather than 32 (as suggested by Martinez and the government) or 36 (as suggested by the probation officer). On the other hand, I conclude that Davilla's base offense level should be 32 (as suggested by Davilla and the government). I therefore reject the quantity stipulations of Martinez and the government, and accept the stipulation of Davilla and the government. Thus, I overrule Martinez' objection to the base offense level calculation in part and sustain that objection in part. As for Davilla's objection to the base offense level, I sustain it. Briefly, my reasons for these findings are explained below.

Without question, Martinez personally dealt far more drugs, including methamphetamine, marijuana and cocaine[14], than

---

**13.** *Apprendi* did not resolve this issue. *Apprendi,* 120 S.Ct. at 2355 n. 3.

**14.** Although marijuana and cocaine were not charged as a part of the conspiracy, those drugs may be counted since they constitute part of the "relevant conduct" of this conspiracy. *See* U.S.S.G. § 2D1.1, comment. (n.12) ("Types and quantities of drugs not specified

the stipulation recommended. I credit much, but not all, of McDermott's testimony against Martinez. It is also clear that Martinez should be held accountable for the methamphetamine delivered to Svoboda and the methamphetamine and cocaine found near the trailer after the delivery to Svoboda.[15] Nevertheless, I do not think that the evidence, viewed with the proper degree of skepticism, permits me to find that Martinez should be sentenced at base offense level 36.[16]

I find that it is more probable than not that: (1) based upon the testimony given by McDermott, Martinez delivered 5 pounds of methamphetamine, 60 pounds of marijuana and 1.5 pounds of cocaine to McDermott during the time frame of the conspiracy; (2) based upon Svoboda's testimony, Martinez delivered 170 grams of methamphetamine to Svoboda during the conspiracy; and (3) based upon Svoboda's testimony, the 180 grams of methamphetamine and 42 grams of cocaine found near the trailer shortly after the delivery to Svoboda belonged to Martinez and was intended for distribution pursuant to the conspiracy. Therefore, Martinez is responsible for 2,618 grams of methamphetamine (converted to 5,236 kilos of marijuana[17]), 722.4 grams of cocaine (converted to 144.48 kilos of marijuana) and 60 pounds of marijuana (converted to 27.22 kilos of marijuana). The total quantity of the drugs, converted to marijuana equivalence, is 5,407.70 kilos of marijuana and that quantity results in a base offense level of 34. U.S.S.G. § 2D1.1(c)(3).

The information that McDermott gave about Davilla, while credible, was presented with far less certainty than the information he gave against Martinez. For example, McDermott admitted that Davilla did not join the conspiracy until late June or early or July, McDermott admitted that Davilla was not present during some of the transactions even after he joined the conspiracy, and McDermott gave estimates that Davilla was involved in as little as 3 pounds of methamphetamine when he was interviewed by defense investigators in the office of his lawyer. Moreover, Martinez told police that Davilla did not know about the methamphetamine and cocaine later found at the trailer. Still further, the only specific testimony about Davilla dealing in other drugs revealed that he distributed about 25 pounds of marijuana near the end of the conspiracy. On balance, it is more probable than not that Davilla was responsible for approximately one-half of the drugs attributable to Martinez or 2,704 kilos of marijuana. That quantity results in a base offense level of 32. U.S.S.G. § 2D1.1(c)(3).

## III. Conclusion

While I believe the Guidelines are sometimes too harsh, I must fairly apply them whether or not I agree with the result. *United States v. McMurray,* 833 F.Supp. 1454, 1458, 1485 (D.Neb.1993) (lamenting, but imposing, a life sentence in a crack cocaine case involving a young pregnant African–American mother of two who had no prior criminal history), *aff'd,* 34 F.3d 1405 (8th Cir.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995). This means that I must not allow the Guidelines to be subverted by blindly following a stipulation that does not reflect

---

in the count of conviction may be considered in determining the offense level. *See id.* § 1B1.3(a)(2) (Relevant Conduct).")

**15.** In coming to a decision on Martinez' base offense level, I have not relied to any degree on statements that he gave to the police.

**16.** I strongly suspect that had the government permitted Svoboda to tell all he knew about Martinez the base offense level would have

remained 36 (or it might even have risen). Nevertheless, I must base my findings on reliable information, and, under the circumstances, the reliable information puts the base offense level at 34.

**17.** U.S.S.G. § 2D1.1, comment. (n.10) (Drug Equivalency Tables and Measurement Conversion Table).

the truth.[18] *See Wehrbein,* 61 F.Supp.2d at 958 (Absent a Rule 11(e)(1)(C) agreement, the parties cannot "stipulate to an incorrect Guideline calculation, and then require the court to implement their error.").

IT IS ORDERED that:

1. Martinez' objection (filing 48) to the computation of his base offense level is denied in part and sustained in part. Martinez' base offense level is set at 34. The probation officer shall prepare a revised presentence report for Martinez consistent with this memorandum and order.

2. Davilla's objection (filing 47) to the base offense level is sustained and his base offense level is set at 32.

3. Davilla's objection (filing 47) to his criminal history score is sustained and his criminal history category is set at I.

4. Davilla's objection (filing 47) to his role in the offense is denied.

5. Davilla's motion (filing 54) for downward departure is denied.

6. The probation officer shall prepare a revised presentence report for Davilla consistent with this memorandum and order, taking care to investigate whether Davilla is eligible for the "safety-valve."

7. Martinez' sentencing is set for 12:30 p.m., on January 25, 2001 and Davilla's sentencing is set for 1:00 p.m., on January 25, 2001.

8. Any defendant who wishes to withdraw his plea shall file a motion requesting permission to do so at least 1 day prior to sentencing.

DATED this 10th day of January, 2001.

---

18. In this regard, I compliment the probation officer, Mr. Avalos. He is to serve the court as an independent voice, and Mr. Avalos did just that.